# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 48348-3-II |
| Respondent, | |
| v. | UNPUBLISHED OPINION |
| STEVEN NICOLAS RUSSELL, | |
| Appellant. | |

MAXA, A.C.J. – Steven Russell appeals his convictions for two counts of third degree assault. Russell was involved in an altercation with several law enforcement officers who had responded to a 911 call concerning possible domestic violence. Russell knocked down one officer and attempted to punch another.

We hold that (1) the State presented sufficient evidence of Russell's intent to assault the officer he knocked down, (2) defense counsel did not provide ineffective assistance regarding a defense of another instruction or by not objecting to witness testimony, and (3) Russell's prosecutorial misconduct claims fail. We also hold that Russell's claims asserted in his statement of additional grounds (SAG) either cannot be resolved on this record or lack merit.

Accordingly, we affirm Russell's convictions.

FACTS

*Responding to Disturbance Report*

Just before midnight on August 7, 2015, police officers responded to a report of a possible domestic violence assault at a residence in Aberdeen. Officers Dale Green and Chad Pearsall arrived at the residence through an alley behind the house. Green went to the house's back door, followed by Pearsall and a third officer, Jeff Salstrom. As they were approaching the house, a fourth officer, Bruce Watts, arrived.

Green pounded on the door repeatedly, yelling, "Aberdeen Police. Open the door." Report of Proceedings (RP) at 35. He opened the door slightly and saw Russell, who pushed back and slammed the door. As Green went to look in the house's window, Russell's sister Patricia Russell, opened the door.

*Entering Russell's House*

Watts, Green, and Salstrom entered the house. Pearsall stayed at the doorway. The door led to a small utility room that connected to a kitchen. Patricia[1] and Russell's girlfriend Laura Maldonado were in the utility room. As the officers entered, the people inside the house were screaming profanities and racial epithets at the officers. Green and Salstrom considered the situation to be dangerous and hostile.

Watts and Green entered the main portion of the house. In the kitchen area, the officers saw Russell and Alejandro Ramirez. Russell was screaming at Watts and Ramirez was telling the officers to get out of the house. Salstrom, still in the utility room, could not get past

---

[1] To avoid confusion, we refer to Patricia Russell by her first name. We intend no disrespect.

Maldonado, who was yelling at him and would not let him by.  When Maldonado continued to obstruct Salstrom's way, he grabbed a hold of her arm and her head or hair and pushed her off to the side, onto a mattress.

*Russell's Assault of the Officers*

As Salstrom grabbed Maldonado, Russell charged toward him.  Green testified that Russell made contact with Green's right side and knocked him down.  Salstrom testified that Russell hit Green's chest and knocked him over and back.  Pearsall testified that he saw Green being pushed back and thrown backwards by a larger male.

Salstrom testified that as Russell charged, Russell's hand was in a cocked, punching position with a closed fist.  Salstrom drew his taser and discharged it at Russell.  The taser hit Russell but had no effect as Russell continued to come towards Salstrom and threw a punch at him.  Eventually Russell ended up on the ground.

Salstrom testified that as Russell continued to struggle, Salstrom punched him two or three times in the side of the head.  Watts assisted and testified that, when he saw Salstrom and Russell struggling, he applied a taser to Russell two or three times.  Salstrom testified that when the taser did not appear to have any effect, he used his pepper spray, applying it into the side of Russell's face.  After using the spray, Salstrom was able to handcuff Russell with the help of Watts and another officer who had arrived.

Russell was charged with two counts of third degree assault, one for assaulting Green and the other for assaulting Salstrom.

*Trial Testimony*

The officers testified as indicated above and about the struggle leading to Russell's arrest. In addition to Salstrom's and Watts' testimony discussed above, Green testified that he heard Russell screaming, the sound of a taser deploying, and officers yelling for Russell to put his hands behind his back. Pearsall testified that Russell was being combative and tried to resist. Russell did not object to any of this testimony.

Officers also testified about scratch injuries they observed on Patricia's chest, but not as to how she got them. Watts testified that when Patricia answered the door, she appeared to have been crying and that she had scratch marks from the base of her neck to her shirt line. Another responding officer testified that Patricia had numerous red marks or scratches on her chest. Russell did not object. Patricia later testified that neither Russell nor Ramirez caused her injuries. She thought they might have come from being grabbed and thrown by a police officer.

Russell testified in his own defense. He stated that Patricia and Ramirez had been having an argument until he separated them, and that when the police officers came in he was shocked and did not understand why they were there. He testified that after the officers entered, he heard Maldonado scream in the back room. He testified that he came around the corner to see an officer holding Maldonado by her hair. He admitted that he may have brushed up against Green but denied knocking him to the ground.

Russell also testified that the officers wrestled him, applied a taser to him multiple times, pepper sprayed him, and hit him in the face even though he was "just sitting there." RP at 229. He testified that he did not assault the officers, and instead the officers did the most damage to him.

*Use of Force Instruction*

As a defense, Russell asserted that the officers had used excessive force and that he had attempted to defend Maldonado. He proposed two instructions relevant to his use of force against the officers. The first proposed instruction stated that a person could use force "to resist an arrest" by a police officer "if the person being arrested is in actual and imminent danger of serious injury from an officer's use of excessive force." Clerk's Papers (CP) at 40. The second proposed instruction stated that a person is justified in using force in the defense of another if he reasonably believes the other person is innocent and in danger, even if that person in fact is the aggressor.

The trial court used elements of these proposed instructions to give a single instruction based on the pattern instruction in *Washington Practice: Washington Pattern Jury Instructions: Criminal* 17.02.01, at 257 (3d ed. 2008) (WPIC). The court's instruction provided that a person could use lawful force against an officer "to resist an arrest or aid another in resisting an arrest" only when "the person being arrested is in actual and imminent danger of serious injury from an officer's use of excessive force." CP at 50. Russell did not object to that instruction.

*Closing Arguments*

In his closing and rebuttal arguments, the prosecutor made several comments that did not directly relate to the evidence. He stated that law enforcement officers "go out there and risk their lives," RP at 289, and that the jury should make Russell "suffer the consequences" by finding him guilty. RP at 298. The prosecutor referred to the officers' use of nonlethal weapons and stated that Russell "ought to be glad it's not the old days when all the cop has is a billy club and a gun." RP at 314. Russell did not object to these statements.

The prosecutor addressed the State's burden of proof, stating that the requirement was that the jury "have an abiding belief. Do you believe it now, you go back there and you talk about it, you come back here and announce your verdict and you still believe it." RP at 293. Russell did not object to these statements.

The prosecutor also asked whether the jury believed Russell's story or the officers' story, stating that the officers would not have entered Russell's house without reason because they knew of the consequences for doing so. He stated, "Do you believe [Russell's] version of events, which is basically that the [officers], working on a bare bones crew, have the time to go bust into somebody's house, risk their careers, their badges, and their pensions." RP at 288. He stated that "[t]he only question is did the defendant assault [the officers]. . . . Of course, he did. The police don't make this stuff up." RP at 292. Russell did not object to these statements.

The jury convicted Russell of both counts of third degree assault. Russell appeals his convictions.

ANALYSIS

A.    SUFFICIENCY OF THE EVIDENCE

Russell argues that the State did not present sufficient evidence to support his conviction for assaulting Green. We disagree.

When evaluating the sufficiency of evidence for a conviction, the test is whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the elements of the crime beyond a reasonable doubt. *State v. Homan*, 181 Wn.2d 102, 105, 330 P.3d 182 (2014). We assume the truth of the State's evidence and all reasonable inferences drawn from that evidence when evaluating whether sufficient evidence exists. *Id.* at

106. We treat circumstantial evidence as equally reliable as direct evidence. *State v. Farnsworth*, 185 Wn.2d 768, 775, 374 P.3d 1152 (2016). And we defer to the trier of fact's resolution of conflicting testimony and evaluation of the persuasiveness of the evidence. *Homan*, 181 Wn.2d at 106.

The State charged Russell under RCW 9A.36.031(1)(g), which states that a person is guilty of third degree assault if he or she assaults a law enforcement officer who was performing his or her official duties. Although the criminal code does not define "assault" as used in RCW 9A.36.031(1)(g), to obtain a conviction under that section the State must prove that the defendant intended to commit an assault, and that the victim was a law enforcement officer. *State v. Brown*, 140 Wn.2d 456, 469-70, 998 P.2d 321 (2000). But the general rule is that the intent required for assault is only an intent to make physical contact with the victim, not an intent for the contact to be malicious or criminal. *State v. Jarvis*, 160 Wn. App. 111, 119, 246 P.3d 1280 (2011).

The trial court's jury instructions defined assault and intent. First, "[a]n assault is an intentional touching or striking of another person that is harmful or offensive regardless of whether any physical injury is done to the person." CP at 49. Second, "[a] person acts with intent or intentionally when acting with the objective or purpose to accomplish a result that constitutes a crime." CP at 49.

Green testified that Russell knocked him down. Salstrom testified that Russell hit Green's chest, knocking Green over and back. Pearsall testified that Russell pushed Green back, throwing him backwards. The officers' testimony, viewed in the light most favorable to the State, shows that Russell intended to push past Green, knocking Green back in the process.

Based on that evidence, the jury could rationally conclude that Russell intended to make physical contact with Green. That intention was sufficient to support the jury's verdict that Russell assaulted Green.

We hold that the State presented sufficient evidence to support Russell's conviction for third degree assault of Green.

B.     INEFFECTIVE ASSISTANCE OF COUNSEL

Russell argues that he received ineffective assistance of counsel because defense counsel (1) failed to propose a proper instruction on defense of another and (2) failed to object to certain witness testimony. We disagree.

1.     Legal Principles

We review ineffective assistance of counsel claims de novo. *State v. Clark*, 187 Wn.2d 641, 649, 389 P.3d 462 (2017). To prevail on an ineffective assistance claim, the defendant must show both that (1) defense counsel's representation was deficient and (2) the deficient representation prejudiced the defendant. *State v. Grier*, 171 Wn.2d 17, 32-33, 246 P.3d 1260 (2011). Representation is deficient if, after considering all the circumstances, it falls below an objective standard of reasonableness. *Id.* at 33. Prejudice exists if there is a reasonable probability that, except for counsel's errors, the result of the proceeding would have been different. *Id.* at 34. We review the challenged conduct from defense counsel's perspective at the time. *Id.*

We begin our analysis with a strong presumption that counsel's performance was effective. *Id.* at 33. To rebut this presumption, the defendant must establish the absence of any " 'conceivable legitimate tactic explaining counsel's performance.' " *Id.* (emphasis added)

8

(quoting *State v. Reichenbach*, 153 Wn.2d 126, 130, 101 P.3d 80 (2004)).  If defense counsel's

conduct can be considered to be a legitimate trial strategy or tactic, counsel's performance is not

deficient.  *Grier*, 171 Wn.2d at 33.

> 2.    Failure to Propose Applicable Defense of Another Instruction

Russell argues that his defense counsel provided ineffective assistance by proposing jury

instructions on the lawful use of force that applied only to the use of force in resisting an arrest.

Russell refers to defendant's proposed instruction 12, which addresses the use of force to resist

an arrest.

However, defense counsel also proposed a separate jury instruction on the use of lawful

force that was not limited to resisting arrest and expressly referenced the defense of another:

> One who acts in defense of another, reasonably believing the other to be the
> innocent party and in danger, is justified in using force necessary to protect that
> person even if, in fact, the person whom the actor is defending is the aggressor.

CP at 40.  This instruction, which was based on WPIC 16.04.01, correctly stated the basic law

regarding defense of another and was factually applicable to Russell's alleged defense of

Maldonado.

Accordingly, we hold that defense counsel did not provide ineffective assistance

regarding the proposed use of force instructions.

> 3.    Failure to Object to Testimony

Russell argues that his defense counsel provided ineffective assistance by failing to object

to testimony about the officers' efforts to subdue him and about the scratch marks on Patricia's

chest.  He argues that the testimony was inadmissible both because it was improper character

evidence under ER 404(b) and it was substantially more prejudicial than probative.  We disagree.

a. Resisting Arrest

Several law enforcement officers testified that Russell had to be shot with a taser, punched, pepper sprayed, and held down by multiple officers before the officers could handcuff and detain him. Russell's defense counsel did not object to this testimony.

However, not objecting to this testimony could have been a strategic decision. Defense counsel explained to the trial court that "[o]ur theory is . . . [Russell] was defending himself. He was defending his home. He was defending a third party and he was defending himself." RP at 270. In closing argument, defense counsel again argued that the police had used excessive force. Defense counsel could have believed that additional evidence of police force may have made Russell's testimony that he was shocked at the police intrusion more credible. Defense counsel also could have believed that the testimony supported Russell's claim that he was defending Maldonado.

Therefore, we hold that defense counsel was not deficient in not objecting to evidence regarding the officers' efforts to subdue him.

b. Injuries to Patricia

The State elicited testimony by officers that Patricia had fresh scratch marks on her chest. Russell's defense counsel did not object.

Defense counsel again could have had strategic reasons for not objecting. Although the officers testified about Patricia's injuries, it was not clear how she got them. She testified that they were a result of the police officers grabbing her when they entered the house. She also denied that Russell or Ramirez caused the scratches, and Russell testified that he did not see

10

them until after the incident. Defense counsel could have decided that this would be helpful evidence as a demonstration of the police officers' excessive force.

Even if defense counsel's failure to object to the testimony was deficient, Russell has not demonstrated that the evidence prejudiced him. There was no testimony that he caused the scratches. In addition, the evidence indicated that Patricia and Ramirez had been fighting just before the officers arrived, potentially implying that Ramirez had caused the injuries.

Accordingly, we hold that Russell's ineffective assistance of counsel claim on this basis fails.

C.     PROSECUTORIAL MISCONDUCT

Russell argues that the prosecutor committed misconduct by improperly inflaming the jury's passions, minimizing the State's burden of proof, and vouching for testifying officers' credibility. We hold that the first two prosecutorial misconduct claims have no merit and that Russell waived the third claim.

1.     Legal Principles

To prevail on a claim of prosecutorial misconduct, a defendant must show that "in the context of the record and all of the circumstances of the trial, the prosecutor's conduct was both improper and prejudicial." *In re Pers. Restraint of Glasmann*, 175 Wn.2d 696, 704, 286 P.3d 673 (2012). During closing argument, the prosecutor is given wide latitude to assert reasonable inferences from the evidence. *Id.* We review the prosecutor's conduct and whether prejudice resulted therefrom "by examining that conduct in the full trial context, including the evidence presented, 'the context of the total argument, the issues in the case, the evidence addressed in the argument, and the instructions given to the jury.' " *State v. Monday*, 171 Wn.2d 667, 675, 257

11

P.3d 551 (2011) (quotation marks and citation omitted) (quoting *State v. McKenzie*, 157 Wn.2d 44, 52, 134 P.3d 221 (2006)).

When the defendant fails to object to the challenged portions of a prosecutor's argument, he is deemed to have waived any error unless the prosecutor's misconduct was so flagrant and ill-intentioned that an instruction could not have cured the resulting prejudice. *State v. Emery*, 174 Wn.2d 741, 760-61, 278 P.3d 653 (2012). The defendant must show that (1) no curative instruction would have eliminated the prejudicial effect, and (2) the misconduct resulted in prejudice that had a substantial likelihood of affecting the verdict. *Id.* at 761.

Misconduct that is relatively minor or insignificant is not grounds for reversal. The Supreme Court has noted that " '[a] defendant is entitled to a fair trial but not a perfect one.' " *State v. Davis*, 175 Wn.2d 287, 345, 290 P.3d 43 (2012) (quotation marks and citation omitted) (quoting *Brown v. United States*, 411 U.S. 223, 231, 93 S. Ct. 1565, 36 L. Ed. 2d 208 (1973)).

2. Analysis

a. Inflaming the Jury's Passions

It is misconduct for a prosecutor to use arguments that are designed to inflame the passions or prejudices of the jury. *See Glasmann*, 175 Wn.2d at 704. A prosecutor's latitude to argue reasonable inferences from the evidence is limited to seeking a conviction based only on probative evidence and sound reason. *Id.*

During closing and rebuttal arguments, the prosecutor told the jury that law enforcement officers "go out there and risk their lives to defend people," RP at 289, that the jury should make Russell "suffer the consequences" by finding him guilty, RP at 298, and that Russell "ought to be glad it's not the old days when all the cop has is a billy club and a gun." RP at 314. Russell did

not object to any of these arguments. He now argues that the statements improperly inflamed the jury's passions.

The first statement, referring to the officers risking their lives, could be regarded as an attempt to make the jury more sympathetic to the officers. But the prosecutor made the statement while arguing that Russell and the others in the house were deliberately refusing to cooperate with the police. This argument was supported by the officers' testimony that they believed that entering the house was very dangerous. Finally, the prosecutor did not suggest that the jurors must convict Russell to preserve order or protect the officers. *Cf. State v. Perez-Mejia*, 134 Wn. App. 907, 917-18, 143 P.3d 838 (2006) (holding that it was improper for the prosecutor to ask the jury to "send a message"). We hold that this statement was not improper under the facts of this case.

The second statement, that Russell should "suffer the consequences," is analogous to stating that the jury should find him guilty. Urging jurors to convict a defendant in order to protect community values, preserve order, or deter lawbreaking is improper. *State v. Ramos*, 164 Wn. App. 327, 338, 263 P.3d 1268 (2011). But arguing that Russell should face consequences for his actions impliedly referenced the evidence introduced at trial and did not ask the jury to base its verdict on improper reasons. We hold that this statement was not improper.

The third statement, referring to the old days and implying that Russell might have been more badly injured, could be understood to suggest that Russell deserved more physical injury than he received. But the statement was made in the context of explaining that the officers had to use less lethal weapons like tasers. Although the argument may have been inartful, we hold that in context, the statement was not improper.

13

b.    Minimizing the State's Burden of Proof

The prosecutor explained the State's burden of proof to the jury by stating, "You have an abiding belief.  Do you believe it now, you go back there and you talk about it, you come back here and announce your verdict and you still believe it."  RP at 293.  Russell did not object.  He now argues that this argument improperly minimized the State's burden of proof because it suggested that the jury need only have an abiding belief for a few minutes.

In *State v. Osman*, the court noted that a jury's " 'abiding belief in the truth of the charge' connotes both duration and the strength and certainty of a conviction."  192 Wn. App. 355, 375, 366 P.3d 956 (2016).  In that case, defense counsel argued that to have an abiding belief in the defendant's guilt, the jurors could not look back on their decision a month or a year later and wonder if they made a mistake.  *Id.*  The court held that these comments did not overstate the State's burden.  *Id.*

Russell argues that *Osman* set a durational requirement for how long a juror's belief in the defendant's guilt must last and that the prosecutor here suggested that the jury's belief need only last for several minutes.  But *Osman* held only that a defense counsel's argument that a juror could not question the result after a month or year did not overstate the State's burden.  192 Wn. App. at 375.  That case did not attempt to quantify how long an abiding belief must last.

In addition, the prosecutor's argument here did not suggest that the jury's belief in Russell's guilt had to last only a few minutes.  The prosecutor's statement that the jury must have an abiding belief at trial, while deliberating, and when returning with the verdict did not imply that the standard of proof required something less than guilty beyond a reasonable doubt.

14

We hold that because the prosecutor's argument did not minimize the State's burden, no misconduct occurred.

c.  Vouching for Officers' Credibility

A prosecutor commits misconduct by personally vouching for the credibility of a witness. *State v. Ish*, 170 Wn.2d 189, 196, 241 P.3d 389 (2010).  Improper vouching occurs when the prosecutor (1) expresses a personal belief in a witness's credibility or (2) refers to evidence not presented at trial to support a witness's testimony.  *Id.*  A prosecutor can argue credibility based only on the evidence or inferences from that evidence.  *See McKenzie*, 157 Wn.2d at 53-54.

The prosecutor made two statements during closing argument concerning the testifying officers' truthfulness.  First, he asked whether the officers would have entered Russell's house without reason when they knew of the potential consequences to "their careers, their badges, and their pensions."  RP at 288.  Second, he stated, "The only question is did the defendant assault [the officers]. . . .  Of course, he did.  *The police don't make this stuff up*."  RP at 292 (emphasis added).  Russell did not object to either of these arguments.  He now argues that the prosecutor improperly bolstered the testifying officers' credibility based on facts not in evidence and improperly vouched for the officers' credibility.

The first statement involved facts not in evidence, and therefore was improper.  The State argues that this statement was not objectionable because the jury could have reasonably concluded that the officers would suffer consequences for entering Russell's house without reason.  But even if it might be reasonable to infer that wrongfully entering the house could affect the officers' careers in some way, there was no evidence that such conduct would affect their badges – i.e., their ability to hold police jobs – or their pensions.  In *State v. Jones*, this

15

court held that a similar argument, that officers would suffer professional repercussions if they used an improper informant, was improper bolstering because that fact was not in evidence. 144 Wn. App. 284, 293, 183 P.3d 307 (2008).

The second statement represented both a personal opinion regarding credibility and referenced a fact not in evidence, and therefore also was improper. The statement did not infer the officers' truthfulness from the evidence, which would have been permissible. Instead, the prosecutor told the jury that police officers "don't make . . . stuff up." RP at 292. And the prosecutor made the statement as if it were a matter of fact, even though there was no evidence in the record that these officers or police officers in general do not make up testimony.

However, because Russell did not object to these statements at trial, he has waived any error unless the misconduct was so ill-intentioned and flagrant that an instruction could not have cured any prejudice. *Emery*, 174 Wn.2d 741, 760-61. Here, the prosecutor's arguments were not particularly flagrant or inflammatory. And if Russell had objected, the trial court could have instructed the jury to disregard the prosecutor's comments. Therefore, we hold that Russell waived his prosecutorial misconduct claim regarding these two statements.

d.    Cumulative Error

Russell argues that the cumulative effect of the prosecutor's arguments amounts to reversible error. Although it is possible for otherwise harmless errors to cumulate, "[t]he defendant bears the burden of proving an accumulation of error of sufficient magnitude that retrial is necessary." *State v. Yarbrough*, 151 Wn. App. 66, 98, 210 P.3d 1029 (2009). The cumulative error doctrine "does not apply where the errors are few and have little or no effect on the outcome of the trial." *State v. Weber*, 159 Wn.2d 252, 279, 149 P.3d 646 (2006).

16

Here, the prosecutor made two statements that improperly vouched for witness testimony. Although improper, when taken together the statements were also not so significant as to suggest that they cumulated to have an impact on the jury verdict. Accordingly, we reject Russell's cumulative error claim.

D.      SAG CLAIMS

In a SAG, Russell asserts four claims. We decline to consider the first two claims and reject the second two claims.

First, Russell asserts that defense counsel told him he had to testify after several jurors indicated that they would find him guilty if he did not testify. Article 1, section 9 of the Washington Constitution protects criminal defendants from testifying against themselves. *State v. Horton*, 195 Wn. App. 202, 214, 380 P.3d 608 (2016), *review denied*, 187 Wn.2d 1003 (2017). However, neither the jurors' comments nor the comments Russell alleges his attorney made are contained in the record. We may consider only facts contained in the record. *Grier*, 171 Wn.2d at 29. Because the record is insufficient, we cannot consider Russell's claim. If Russell wants to rely on facts outside the trial record, he must file a personal restraint petition. *Id.*

Second, Russell asserts that one juror stated that his family did business with officer Salstrom's family and that a second juror said she was friends with officer Pearsall's wife. Russell has a right under article I, section 22 of the Washington Constitution to an impartial jury. *See State v. Momah*, 167 Wn.2d 140, 152, 217 P.3d 321 (2009). However, again the record does not contain the allegedly improper statements or show whether the statements were made by anyone empaneled onto the jury. Because the record is insufficient, we cannot consider

Russell's claim. To challenge these statements, Russell must file a personal restraint petition. *Grier*, 171 Wn.2d at 29.

Third, Russell asserts that the trial judge improperly agreed with the State while discussing Russell's proposed self-defense instruction. The State had argued that the instruction was not appropriate and might cause confusion for the jury. The judge concluded that it would give the instruction largely as Russell proposed. The judge stated:

> I just think under the circumstances of the case I'm going to give [the instruction] and – you [the prosecutor] might be right. You're probably – you've tried more cases up here than – than I have. So we'll see [what] the jury comes up with and we'll deal with that at the time.

RP at 272. Russell apparently asserts that this statement shows that the trial court was biased in favor of the prosecutor. But there is no basis for finding bias based on this statement. We reject Russell's claim.

Fourth, Russell asserts that Salstrom used improper force against Maldonado even though he was not detaining or arresting her. This fact is only relevant to Russell's case in that it might have provided a basis for Russell to have lawfully used force to defend Maldonado. However, the jury heard testimony and received an instruction on lawful use of force as a defense to the charge of assault. We reject Russell's claim.

E.    APPELLATE COSTS

Russell asks that we refrain from awarding appellate costs if the State seeks them. We decline to consider this issue. A commissioner will determine whether to award costs under RAP 14.2 if the State files a cost bill and if Russell objects to that cost bill.

CONCLUSION

We affirm Russell's convictions.

18

No. 48348-3-II

A majority of the panel having determined that this opinion will not be printed in the

Washington Appellate Reports, but will be filed for public record in accordance with RCW

2.06.040, it is so ordered.

MAXA, A.C.J.

We concur:

JOHANSON, J.

LEE, J.